The Court said they were unable to see any ground for interfering with the proceedings. The statute in respect to summon *436 ing additional jurors (2 R. S. 733,4, § 3,) prescribes no precise limit as to number, but says that the sheriff shall be directed to summon so many as are necessary to make at least twenty-four jurors from whom a jury to try the indictment maybe selected. How many are necessary for this purpose must often depend upon the probable state of public sentiment with regard to the prisoner, and other like circumstances, the force of which can be best appreciated by the court where the cause is tried. The matter should therefore be left to the sound discretion of that court; and such we believe was the intent of the legislature. Besides, the result in this case shows that the number ordered to be summoned was hardly large enough; at all events, there is no ground for saying it was too large. As to the refusal of the court to postpone, this was also matter resting in discretion, and therefore not the subject of review in the present form. (Woods v. Young, 4 Cranch, 237.) Were it otherwise, however, a further answer might be given ; viz. the question did not arise “ on the trial,” and hence cannot enter into a bill of exceptions. (2 R. S, 736, § 21.) The point upon the admission of evidence tending to prove the death to-have been caused by the discharge of a pistol, was properly disposed of in the court below. It presented at most a question of mere variance as to the najne or kind of instrument used, which the modern cases, whatever may be said of the older ones, do not regard gs material. (3 Chitt. Cr. Law, 734, Am. ed. 1841 ; Rosc. Cr. Ev. 577, 8 ; see also State v. Mairs, 1 Coxe’s Rep. 453 ; Commonwealth v. Boies, 1 Russ, on Cr. 467, note (1), Phil, ed, 1836.) There was a count, moreover, charging the death to have been produced by an instrument “ to the jurors &c. unknown.”
The proceedings must be remitted to the oyer and terminer, with directions to proceed and pass sentence.
Ordered accordingly.(a)

 The prisoner was sentenced to be executed on the 18th November, 1842, *437 Shortly after the sentence an application was made in his behalf to Kent, C. Judge, who presided at the trial, for the allowance of a writ of error with a stay of proceedings in order to carry the cause before the court for the correction of errors; but the application was denied. During the general term of the supreme court in October, 1842, the prisoner’s counsel renewed the application before Mr. Justice Cowen at chambers, who thereupon conferred with the Chief Justice and Mr. Justice Bronson, and the result was a unanimous opinion that no stay ought to be granted. A still further application was made to Chancellor Walworth on the 3rd of November, 1842, who also refused it; on which occa. sion he delivered a very able written opinion reviewing the points appearing in the bill of exceptions, together with some others not taken at the trial. One of the latter questioned the due organization of the oyer and terminer which tried the cause, on the ground that the aldermen who, together with the circuit judge, formed the court, were not authorized to act as judges. The following extracts from the chancellor’s opinion exhibit the view taken by him of that subject not only, but of the points decided by the supreme court:
“ The summoning so large a number of additional jurors was a matter of sound discretion, to be exercised by the court with a view to get a sufficient number who were qualified and competent to discharge the duty, from which a full jury could be obtained. Such discretion must of course rest upon the knowledge which the court possessed out of the case of the probable effects which a report of the facts in the public papera, and otherwise, might have had in biassing the minds of jurors so as to disqualify them from serving on the trial. And although the particular circumstances which operated upon the minds of the judges to induce them to order so large a number to be summoned cannot appear upon the record, the result which does appear conclusively shows that the number ordered to be summoned was not unnecessarily large,” &c.
“ I think the circuit judge was right according to the settled law in allowing evidence to be given to raise a presumption that the small wound in the side of the head of the deceased was caused by a pistol ball, under either count of this indict, ment. As there was no evidence before the grand jury or known to the prosecu. tion at the time of finding the indictment, to show with any thing approaching to certainty, or even probability, what instrument was used to produce that wound, which, of itself was sufficient to produce death, it was proper to charge in the indictment that a mortal wound was inflicted with some instrument to the jurors unknown. And under that count it was allowable to introduce the evidence that the prisoner had in his possession such pistols, and that a ball propelled by the explosion of a percussion cap would be likely to produce such a wound—or the public prosecutor, under that count, might have produced evidence of .the prisoner’s having in his possession such pistols for the purpose of satisfying the jury, if possible, that he had taken the ramrod from one of them, when the witness Wheeler saw him go to the table, and had driven it into this part of the head by a blow from the hatchet, while the deceased was lying senseless on the floor,” &c.
“ The objection as to the organization of the court involves the question whether there has bepn any court of oyer and terminer constitutionally organized in the *438 city of Ncw-York since the first of January, 1823, or whether every conviction in that court for the last twenty years has not been illegal and unconstitutional, ex. cept in one case in which a special commission of oyer and terminer was issued. Indeed, it involves the question whether any court of oyer and terminer can be held in this city, under the provisions of the revised statutes, without such a special commission to be issued by the governor with the advice and consent of the senate. For, such courts, by the provision of the revised statutes, (2 R. S. 204, § 28,) must be held by one or more justices of the supreme court, or of the circuit judges, or by the first judge of the common pleas, together with the mayor, recorder and aldermen of the city, or with two of them. That is, if all the justices of the supreme court or all the circuit judges were present on the bench, they could not hold a court without having also associated with them the mayor, recorder and aldermen, or at least two of those officers. And, as the mayor as well as the aider-men are now elective, if none but those who are appointed by the governor and senate can act as justices of the oyer and terminer, it follows of course that there is no law in force by which a court can be organized there, without calling the senate together to consent to the issuing of a special commission. This does not show that the prisoner or any other person who has been convicted in the oyer and terminer within the last twenty years in the city of New-York, if not already executed, may not still raise the constitutional question which is now agitated. But this long acquiescence in the construction of the constitution renders it highly probable that the construction which was given to it upon the first organization of the government under it in 1823, and which construction has been also given at nearly every session of the legislature since that time, is most probably correct. Still, if there is any reason to believe that the judgment in the present case will be reversed by the court for the correction of errors on that ground, and certainly if I have any reason to doubt whether the prisoner has or has not been convicted before a court organized in direct violation of a positive provision of the constitution, I cannot refuse him the benefit of a writ of error where I have the power to grant it. I therefore proceed to examine the grounds upon which his counsel suppose it probable that the judgment may be reversed on account of the supposed illegal organiza, tion of the court.
“ In the case of The People, ex rel. the Attorney General, v. Varian, the mayor, and certain aldermen of the city of New-Yorlc, which arose out of the trial of a justice, in the court of common pleas, for alleged misconduct, the question was brought before the supreme court, whether the mayor and aldermen, or either of them, could constitutionally act as judges of the county court. That court unanimously decided the constitutional question in favor of the mayor and aldermen. And the case being carried to the court for the correction of errors, the judgment of the supreme court was affirmed by a tie vote: seven of the law members of that court voting in favor of affirmance, and Messrs. Root, Dixon and Lee, who were also lawyers, voting for a reversal of the judgment of the court below; It will be seen, however, by an examination of the opinions of Mr. Dixon and Gen. Root, that they placed their opinions upon two provisions of the constitution, the last of which has no application to this case; the first being the general provision as to the *439 appointment of judicial officers, and the other being that which in express terms requires judges of the county courts to be appointed for five years. And it is evident that Senator Dixon’s opinion was mainly based upon this last clause of the constitution. Senator Hull also, a most worthy and conscientious member of that court, who is not a lawyer, but who delivered a written opinion in favor of the reversal of the judgment of the supreme court, confined his remarks to the right of the mayor and aldermen to act as judges of the court of common pleas in violation, as he susposed, of the constitution; and says nothing of their right to act as justices of the oyer and terminer. It is very doubtful, therefore, whether any considerable number of those who voted to reverse the judgment of the supreme court would have given the same vote if the question had arisen as to the right of the mayor and aldermen to act as justices of the oyer and terminer in New-York and other cities of the state where the statutes have authorized them to act as such.
“ Again, the case of The People v. White, (24 Wend. 520,) was decided by the same court, and at the same time; in which case the question as to the right of the aldermen to act as justices of the oyer and terminer arose, and had been argued by counsel. And in that case both General Root and Senator Dixon held that the fact that aldermen acted as justices of the oyer and terminer upon the trial of the prisoner was no ground for reversing the judgment. I think, therefore, that if this case had been brought before the judges who decided the case first referred to, upon the question which the prisoner wishes to raise as to the organization of the court, there is not the remotest probability that he would have succeeded in reversing this judgment, and there probably would not have been two votes in his favor on that ground. For the same and other reasons, I do not think it probable that any considerable number of those who now are or hereafter may be members of that court, will vote to reverse a judgment on the ground that aider-men were associated with the circuit judge in the organization of the court of oyer and terminer before which the prisoner was tried.
“ It is true, I then did and do still difier in opinion with those who think a prisoner cannot upon a writ of error avail himself of the objection that the law organizing the court before which he was tried and convicted, was unconstitutional; even if the judges of such a court would not themselves be liable to be punished criminally for directing their illegal sentence to be executed upon him. But I am much more confident that I am right in supposing there is not the least probability that the court of dernier resort, to which it is now sought to carry this case for review, will reverse the judgment on the ground that the court of oyer and terminer was not properly organized.”
After the decision of the chancellor, the authority of the executive was appealed to in behalf of the prisoner; and on the 11th of November, 1842, Governor Seward, in an elaborate and masterly review of the whole case which was published shortly afterwards in the state paper (The Albany Evening Journal) announced the result, declining to interpose. He agreed entirely with the supreme court as to the law of the case, and thought the conviction fully- warranted by the evidence. ■
*440 The prisoner however was not executed. On the day appointed for that purpose, and while the preparations for it were going forward, he was found dead in prison, having committed suicide but a few moments before by stabbing himself with a dagger furnished him by some unknown hand.
END OF JULY TERM.